On the Merits.
1. Tlie first question presented for our consideration on the merits, is whether the proceedings in the suit 2926, for the partition and sale of the Starlight Plantation, the property in controversy, was null, for want of jurisdiction in the District Court of DeSoto Parish, where the proceedings were had and the judgment rendered.
This was a suit instituted, as is^stated, by the surviving partner in community against the heirs of the deceased partner for a partition oftlie community property. The suit was brought after a final account of administration of the succession had been filed and homologated, and the property to be divided ordered, in the judgment homologating the account, to be turned over to the surviving partner in the community and the heirs of the deceased. The question presented, were it a new one, would not be free from difficulty, and the argument of plaintiffs’ counsel to the effect that the Probate Court alone could entertain jurisdiction of such a proceeding would possess great weight, and might reasonably induce the conclusion in the judicial mind of the correctness of the proposition. The question, howevfer, is not a new *294 one, and whatever may be our views of the decisions which oppose such a conclusion, the jurisprudence on this point may now be considered settled, and settled adversely to the position held by the plaintiffs’ counsel. Frequent decisions have established that the jurisdiction of such cases, under the conditions stated, is not in the Probate Courts, but in courts of ordinary jurisdiction. Gage vs. Price, 30 A. 93; Boutte vs. Boutte, 30 A. 177; Buddecke vs. Buddecke, 31 A. 572.
This ground of nullity to the proceedings in question we cannot, for these reasons sustain, and we will therefore proceed to tire consideration of the question of fraud, collusion, etc., set up and charged as sufficient in themselves to avoid the proceedings complained of.
2. At the second marriage of the plaintiff, Mrs. Gillespie, and when her administration of her first husband’s estate was closed in 1870, she and her minor children were the owners of a valuable plantation and other property, sufficient to have insured them comfortable maintenance, and support. In a few months afterwards, they found themselves stripped of all they possessed, turned out of their home, reduced to comparative destitution, and at the time of bringing- this suit, dependent for their subsistence on a few acres of land given them by a charitable neighbor. If these changes of condition were the results of their own acts or the acts of their legal representatives, or were brought about by the proper judicial proceedings to which they were parties, personally or through parties authorized to act for them, then, deplorable as these changes and vicissitudes may appear, they have no legal grounds for complaint. On the other hand, those who claim that sue,If valuable “rights of the plaintiff have been transmitted to them by-virtue of their acts, or of legal proceedings, can only be secure in their acquisitions, if these acts or proceedings relied on are found, after a close judicial scrutiny, to be under the sanction and protection of the law.”
The evidence is voluminous and conflicting, and has been thoroughly-examined and weighed, and from this examination and study we have derived the following conclusions as to the facts bearing on this controversy.
When the administration of the succession of W. E, Hall, the first husband and father, respectively, of the plaintiffs, was closed, there were no debts resting- on the property, and no good reason existed, so far as we have been able to discover, why the interest of the mother in the property should be sold, or any different investment made of the means of her minor children.
Yet, two days after the settlement of the succession and the homologation of the account of administration, proceedings were instituted and rapidly pressed, as if it was an occasion of great urgency, to procure *295 n salo of this valuable property, upon which, the mother and children had so long had their home, a home established by the mother and her deceased husband, improved and made comfortable by their joint labor, and where their children were born. This proceeding was instituted at the instance of C. K. Gillespie, the second husband and step-father, the wife and mother being in entire ignorance of the step taken. When the attorney consulted desired an authorization from her, Gillespie produced a note purporting to be written by his .wife, but which, she swears, she never wrote or signed, and which, wo believe, was forged by him. At the request of Gillespie, one member of the law firm consulted, consented, and so far as the record shows, without the knowledge of the mother, to become the tutor of tlie children, although the mother had the right to such appointment, notwithstanding she may have at one time forfeited the tutorship by her second marriage, without taking the required steps to be continued in it previous to the marriage. The attorney who instituted this suit of partition, by means of which the plaintiffs were to be despoiled of their projierty, as a witness in the case thus speaks of the man at whose instance the proceeding was inaugurated: “I know nothing about Gillespie’s character as a husband, except, from common report, and that was, that he was unkind, unjust and cruel, and that he was sedulously endeavoring for years to swallow up her fortune.” With the evident design to absorb as much of the proceeds of the projected sale for his wife, at the expense of the children, and thus put these proceeds under his immediate control, the mother was made to sue her children for $12,700, to be paid out of the proceeds of the property, a claim which was embodied and prosecuted in the partition suit, and which the mother swears the children did not owe her, and which her account of administration, previously homologated, shows to have been false and fictitious, as all her claims against her first husband’s estate were settled in that account. Yet the minors were not only sued for this amount, but judgment rendered against them for nearly the entire sum.
■ Certain events which had transpired previous to the bringing of this partition suit, afford the clue by which we can fully discover its purpose and the reason of the haste with which it was rushed through. In fact, the property had already been sold, as .far as the power and will of Gillespie could accomplish a sale of it, and a delivery of it made before the suit for its formal sale was begun. The purchaser at this sale made by Gillespie, or, perhaps, to express it more literally, agreement to sell, was M. H. Twitchell, one of the defendants in this suit, who subsequently became the adjudicates at tho sheriff’s sale of the property. The evidence satisfies us that Twitchell, in furtherance of his desire to acquire the property at .wliat he doubtless considered .an advan *296 tageous bargain, lent himself fully to the scheme by which, through color of legal proceedings, the property was to become his, and with the full knowledge that Mrs. Gillespie was unwilling to sell her and her children’s property, and had resisted the coercion of her husband to make her consent thereto, and had declared to Twitehell himself her refusal to consent: We have the testimony of Twitehell against this, who swears that he had the written consent of Mrs. Gillespie to this sale; but this assertion is proven to be false, not only by this lady and. another person present at the time, hut also by one of his own witnesses, and the witness he failed to produce on the trial. The true facts relating to the negotiation between Gillespie and Twitehell, for the sale of the property, as we gather from a close study of the evidence on this point, which, as intimated, is conflicting, we believe to be these: Twitehell made a proposition to Gillespie to buy the place, and after some discussion between them, the proposition was accepted and the price and terms agreed on. It was then deemed necessary that the consent of Mrs. Gillespie should be obtained. Gillespie undertook to obtain this consent, and for that purpose went into his wife’s room, and after quite a lengthy and stormy interview, came hack again into the parlor and declared to one of the persons present, with an oath, and a vile epithet applied to his wife, that she had refused to consent to the sale. A whispered conversation then took place between Gillespie and Twitehell, and the latter though an entire stranger to the lady, boldly invaded the privacy of her bedchamber with a view to induce or extort a consent to the joint scheme of Gillespie and himself for the sale of the property. He too was foiled, and then the two schemers contented themselves with a writing signed alone by themselves, by which they undertook to do what they had both declared to Mrs. Gillespie could he done; make the sale without her signature, that is against her will. The details of these conversations with her husband and Twitehell are given in evidence by Mrs. Gillespie, who was a witness in the case, and presents the plain, unvarnished story of how a wife, who for years had been the victim of abuse, cruel treatment and tyranny on the part of a brutal husband, exercised at the same time over her oiqflian children, resisted both the threats and imprecations of the husband, and the oily and persuasive inducements held out by his more discreet ally, in what she conceived to he an attempt to despoil- her and her children of their heritage. Under this unhallowed agreement between them, Twitehell was put into immediate possession of the property, and the proceedings were then instituted and conducted, as related above, for the formal sale and adjudication of the property. They were conducted with the evident concurrence of the person appointed at the request of Gillespie to represent his minor step-children, and judgment was rendered *297 ordering the sale of the property, and condemning the children to pay their mother the large sum mentioned above out of the proceeds of the sale. It was, in one sense of the word, a consent judgment — not a consent, it is true, by the parties to the suit really interested, or to be affected by the proceedings, but on the part of those conducting the proceedings in their names for their own purposes. During the pendency of these proceedings, Gillespie had his eye on a neighboring plantation which he wanted to buy with the assistance of Twitchell, and with the money he was to receive for the plantation of Iris wife <and her children. This part of his scheme was carried out, and he made a contract which was virtually a contract of sale, with the owners of this plantation, known as the Turner heirs, and this contract was attested by Twitchell, as a witness. It stipulated that a title to this property was to be made to Gillespie, upon the payment of a certain amount in cash and Gillespie’s notes for the balance of the purchase x>rice. In pursuance of this contract after the sale of the Starlight Plantation and its adjudication to Twitchell, he x>aid the cash required by the terms of the sale, not to the sheriff who made the sale, nor to Mrs. Gillesx>ie and her children, to whom the property belonged, but to the Turner heirs, to meet the obligation of Gillesx>ie for the cash x>ayment he was to make them for the x>lantation bought of them as stated, and it was doubtless understood by Twitchell at the time he witnessed the contract for the sale of this x>roperty, that Gillespie, was to use the money realized from the sale of the Starlight Plantation, to pay for the plantation bought by Gillesx>ie of the Turner heirs. The formal deed to the plantation was made to Gillespie and Mrs. Gillespie, but this gave the latter no more rights in the property than if the title had been made to Gillesx>ie alone, in conformity to the original agreement. And the evidence shows that subsequently another x>ayment was made to the Turner heirs for Gillesxñe, with the money paid by Twitchell to the tutor ax>pointed to the children for the purposes of the partition sale.
After the adjudication of the Starlight Plantation to Twitchell, Mrs. Gillesx>ie was compelled, as she states in her testimony, to quit the X>lace under a threat of being put off by the sheriff. She subsequently-went to the plantation bought of the Turner heirs by Gillesxne, and after remaining there about a year, was abandoned by her husband, who received the revenues of the property and left the x>lace to be sold for the unx>aid part or the price, and went to parts unknown, and the purchaser at this last sale charitably bestowed on Mrs. Gillespie and her children, a few acres of land on another place, which afforded them a shelter and a scanty subsistence, and where they seem to have remained up to the time of the institution of this suit.
Prom the conclusions we have formed of the facts of this case,' as we *298 have detailed them above, it is clear that the rights of plaintiffs to the property ill controversy were not destroyed or divested by these proceedings, to which, under the evidence, wo are bound to regard them as strangers. The conviction is firm in our minds that the proceedings were planned by Gillespie to defraud his wife and her children of the property, and to acquire the same, or its proceeds, for his own use and enjoyment. 'That it was a scheme of pure spoliation, devised by him, and to which Twitchell lent himself as a willing and efficient coadjutor. Believing this, it would require very strong proof to satisfy ns, that the wife had so approved and ratified this outrage upon the rights of herself and children, as to make the scheme successful, and forever preclude them from attacking it. Of course, so far as relates to the minors’ interests, no acts of their mother could cure the fraudulent and illegal alienation of their property. The question recurs, has Mrs. Gillespie, by her acts, or otherwise, ratified the sale of her property and debarred herself from recovering if? The counsel for defendants insists she has dono so, and relies mainly on her signing a- receipt for the cash payment made by Twitchell on the Starlight Plantation, and her judicial declarations, subsequently made in a suit brought by her against her husband for a divorce, in which a claim was preferred against him for monoys realized from the sale of her property.
In regard to’ the cash payment, wo have stated, that in point of fact, the money was not paid to her, either by the sheriff, to whom the receipt was given, or by Twitchell, birt was paid by the latter to the Turner heirs fpr Gillespie, on the price of tho place purchased from them, and the receipt was signed, at the very time this payment was made, in tho presence of her husband; and she states, on oath, that she signed without reading it, and further, that she believed, at the time, that it was a paper connected with the purchase of tho Turner Plantation, and not with the sale of Starlight Plantation, a statement which seems reasonable and in consonance with the facts attending this transaction.
Besides, even were it otherwise, the wife, at that time, was under marital influence, which, as the testimony shows, had been harshly and even cruelly exercised. It is shown that she had good cause to dread and fear him, her husband, and that he even used violence towards her, and had been arrested on account of it. In the case of Decuir vs. Lejeune, 15 A. 569, a case very similar in many respects to the instant one, the Court used this language: “ When Ovide Lejeune and Margaret C. Decuir started in life, nearly the whole property belonged to her. After the lapse of a few years the whole estate is absorbed by the husband. * * * Such a result is a spoliation, unless the plaintiff has knowingly and willingly made a sacrifice of her rights, *299 aud before fastening this loss upon her, it is but natural that the Court should require cogent evidence as to a voluntary execution on her part, within the intendment of the ' Code. The only ground upon which the plaintiff can be cast is that of confirmation or ratification on her part since the dissolution of their marriage. It is evident no acts of the'mfeprevious to that event can hare that effect.” See also 2 A. 213 ; 7 A. 293 ; 16 A. 213.
The marriage in this case has never been dissolved. A suit for divorce was instituted by the wife, but was never prosecuted to a judgment. In that suit the counsel bringing it, who were the same engaged in the partition suit, claimed judgment for moneys spent by Gillespie in the purchase from the Turner heirs, but Mrs. Gillespie swears, that she knew of and authorized no other suit or demand than a simple divorce, and it is highly probable that these attorneys, being familiar with the previous proceedings connected with the receipt of this money by Gillespie, might have thought proper to include such a money demand in the divorce suit, on their own motion. Had those proceedings been authorized bjr her, then the indebtedness of Gillespie to his wife would have existed, and the monied demand in the divorcosnit a proper one. A^the time this divorce suit was brought, Mrs. Gillespie had been driven from her home; had been robbed of her property by her husband, and then abandoned by him and left with her children in almost absolute destitution ; and if in her perplexity and distress she sought the advice of counsel, and they, with or without her knowledge, tried to save something for her and her children out of the wreck of the property standing in Ms name and liable for his debts, it would be an unwarrantable stretch of the laws bearing on this point, that such simple acts on the part of a married woman, under such circumstances, sanctioned and ratified and made good the frauds and spoliation by which, without her knowledge and consent, she had been stripped of all her earthly goods and possessions. It would be a perversion of the law so to conclude. The evidence fails to show that either Mrs. Gillespie or her children ever received one dollar from the sale of their property; and in view of this, their alleged liability to Twitcbell, so gravely urged, to tender restitution of the amounts he paid out for the property —not to them, but to one or for one he was assisting in despoiling them, seems to us out of reason. They received nothing, and they have nothing to restore or offer to restore.
Another question for us to consider, is that relating to the alleged simulation of the sale from M. H. Twitcbell to his mother, Mrs. Elizabeth Twitcbell, co-defendant in the case.
The plantation in question purports to have been bought by Twitchell for $21,000, and he claims to have put improvements on it more *300 than ten thousand dollars in value, and then sells it for $7,500 ; $1,000 of that amount cash and the balance in worthless Parish bonds and warrants, and known to be worthless at tho time of the sale, and had boen so judicially declared! These bonds had once been issued to, or belonged to Twitch ell, and now purported to be tho property of his mother in the distant State of Vermont, and who was there at tho time of the alleged sale, which was passed in Louisiana, and who states, in her testimony taken under commission, that she owned in property and money only one thousand dollars/and that was in the hands of lier son, in Louisiana, (M. H. Twitcliell) and that she owned nothing in Vermont. Comment is useless. The simulation was one of the baldest!
As to the subject of improvements, which are claimed in reconvention, we find that there is no satisfactory proof as to their value.
. Besides, there is no demand in the plaintiffs’ petition for the rents and revenues of tho property during the time they have been deprived of the possession of tho same, and under these circumstances we deem it proper that these questions should be settled in another suit, and wo shall reserve this right to the parties.
It is only necessary to add, in conclusion, that the prescription pleaded under the facts of this case, is not applicable and is without force.
It is therefore ordered, adjudged and decreed, that the judgment of the lower court, so far as it is in favor of the plaintiffs, the heirs of Wm. E. Hall, deceased, and against the defendants, is affirmed, and so far as it rejects the demands of the plaintiff, Mrs. Caroline Gillespie, it is annulled, avoided and reversed, and it is now ordered, adjudged and decreed, that the judgment rendered in the case of Caroline Gillespie vs. J. D. Wemple, tutor, No. 2921, in the District Court of the Parish of DeSoto, on the 17th March, 1870, and the sheriff’s sale under said judgment, on the 30th of April, 1870, of the property in controversy, be, and tho same is hereby declared null.and void.
It is further ordered, adjudged and decreed, that the right, and title of the said plaintiff, in and to one undivided half of the property described in tho petition, be, and the same is recognized, and that she be put in possession of the same, the right of tho plaintiffs’ to the rents and revenues of said property, and of the defendants to recover the value of the improvements, is reserved.
It is further ordered, adjudged and decreed, that the sale of the property from Marshall H. Twitcliell to Elizabeth Twitcliell, of the 2d of February, 1877, be, and tho same is declared simulated, null and void. The costs of both Courts to be paid by the defendants.